# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: October 19, 2021

```
* * * * * * * * * * * * * * **
BRANDON HOOD,                    *      PUBLISHED
                                 *
            Petitioner,          *      No. 16-1042V
                                 *
v.                               *      Special Master Katherine Oler
                                 *
SECRETARY OF HEALTH              *      Ruling Awarding Damages;
AND HUMAN SERVICES,              *      Pain and Suffering; Vocational
                                 *      Expenses; Influenza ("Flu") Vaccine;
            Respondent.          *      Guillain-Barré Syndrome ("GBS").
                                 *
* * * * * * * * * * * * * * **
```

*Richard Gage*, Richard Gage, P.C., Cheyenne, WY, for Petitioner
*Mallori Openchowski*, U.S. Department of Justice, Washington, DC, for Respondent

## RULING AWARDING DAMAGES[1]

## I.      INTRODUCTION

On August 23, 2016, Brandon Hood ("Petitioner") filed a petition under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"),[2] 42 U.S.C. § 300aa-10 *et seq.* (2012). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine administered to him on December 5, 2014. Petition at 1.

On July 13, 2017, Respondent filed his Rule 4(c) Report in which he stated he does not contest that Petitioner is entitled to compensation in this case. Respondent's Report ("Resp. Rept.") at 1. A Ruling on Entitlement was issued on November 15, 2017. Ruling on Entitlement (ECF No.

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012). All citations in this decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

35). The parties subsequently asked me to issue an award on damages, with respect to certain disputed items.

For the reasons set forth below, I find that Petitioner should receive an award for actual pain and suffering in the amount of $200,000.00, and an award for future pain and suffering in the amount of $1,000.00 per year, for the remainder of Petitioner's life. I additionally award $13,824.00 for work hardening program expenses, $182.40 for transportation to the work hardening program, and $1,360.00 in math tutoring costs.

## II.    PROCEDURAL HISTORY

Mr. Hood filed his petition for compensation on August 23, 2016. ECF No. 1. On October 7, 2016 he filed medical records and a statement of completion. ECF Nos. 6-9. He filed additional medical records on December 7, 2016 (Exs. 9, 10) and on April 28, 2017 (Ex. 11).

On July 13, 2017, Respondent filed his Rule 4(c) Report stating that he does not contest entitlement in this matter. Resp. Rept. at 1. The Special Master previously assigned to this case issued a Ruling on Entitlement in Petitioner's favor on November 15, 2017. ECF No. 35.

I held a status conference on January 11, 2018 to discuss the damages phase of the case. Scheduling Order dated January 12, 2018; ECF No. 40. After that status conference, I ordered Petitioner to file affidavits and updated medical records. *Id.* In accordance with this order, Petitioner filed affidavits on January 26, 2018. Exs. 13, 14. He filed updated medical records and other documentation over the next several months. Exs. 15-23.

The parties then attempted to informally resolve damages. Petitioner filed a life care plan on March 5 and 21, 2019. Exs. 24, 25. Respondent filed reports from his life care planner and his economist on March 9, 2020. Exs. A, B, D. In a status report filed on May 13, 2020, the parties indicated that they had been unable to resolve the case and requested that I conduct a damages hearing. ECF No. 75.

I held a status conference on May 27, 2020 after which I ordered the parties to provide their availability for a one day damages hearing. Scheduling Order dated May 27, 2020.

I held another status conference on June 15, 2020 to discuss Respondent's concern that Petitioner had not filed a report from a vocational expert. During this status conference, Petitioner requested 30 days to file a report from a vocational rehabilitation expert. I granted that request. Scheduling Order dated June 15, 2020. ECF No. 80.

Petitioner filed a report from a vocational expert on July 15, 2020. Ex. 27. Respondent filed a supplemental report from his economist on August 27, 2020. Ex. E. Petitioner filed a supplemental report from his vocational expert on September 3, 2020. Ex. 28.

I set a damages hearing for October 1, 2020. Pre-hearing Order dated June 19, 2020. ECF No. 81. The parties filed their respective pre-hearing submissions from September 3 to September 18, 2020. ECF Nos. 87, 90, 92.

On September 17, 2020, Petitioner filed a report from his economist. Ex. 29.

I conducted a damages hearing on October 1, 2020. During the hearing, the parties were able to narrow the issues that needed to be decided. After the hearing, the parties continued to negotiate certain costs associated with the case. ECF Nos. 98-101.

On April 19, 2021, the parties filed a joint status report indicating that they had been unable to reach an agreement regarding certain costs surrounding Petitioner's acquisition of a GED and his participation in a work hardening program. They asked that I resolve those matters in addition to an appropriate amount for Petitioner's pain and suffering. ECF No. 107.

Petitioner and Respondent filed post-hearing briefs on May 24, 2021. ECF Nos. 109, 110. Petitioner filed a reply brief on May 27, 2021. ECF No. 112. This matter is now ripe for a determination on damages.

## III.    FACTUAL SUMMARY

Petitioner, born in 1982. He was 32 years old when he received a flu vaccination on December 5, 2014. Ex. 8 at 1.

On December 28, 2014, Petitioner presented to the ER with left-sided facial droop which had started the day prior. Ex. 7 at 348, 382. Petitioner also reported numbness in his hands and legs for the past week. *Id.* at 382. Petitioner was diagnosed with Bell's palsy. *Id.* at 365.

On December 31, 2014, Petitioner visited his PCP, Dr. Ryan Jennings. During this visit, he reported muscle weakness and paresthesias that had been present in a persistent yet stable manner since his visit to the ER. Ex. 4 at 6. Dr. Jennings indicated Petitioner should complete his course of prednisone. *Id.* at 8.

Petitioner returned to his PCP on January 8, 2015 reporting that he continued to experience constant pain and paresthesias. Ex. 4 at 9. Petitioner indicated that he had fallen four times. *Id.* Dr. Jennings opined that Petitioner likely had GBS and referred him to a neurologist. *Id.* at 11.

On January 12, 2015, Petitioner was admitted to Memorial Hermann Hospital after reporting numbness and weakness in his extremities for one month. Ex. 4 at 15. Petitioner's examination revealed mild generalized weakness, 4/5 muscle strength, and decreased sensation to pinprick in the fingers, toes, and the bottom of his left foot. *Id.* at 16. Petitioner's deep tendon reflexes were recorded as "0" in all four extremities. *Id.* Petitioner was confined to a wheelchair but was able to walk slowly with a walker. *Id.* The impression was "progressive quadriparesis, rule out Guillain Barre syndrome." *Id.* Petitioner began a course of IVIG. Ex. 6 at 5.

Petitioner was discharged from the hospital on January 18, 2015. Ex. 4 at 13. The medical records note that the weakness in his extremities was better, but that he was still experiencing numbness in his fingers and toes. *Id.*

On January 18, 2015, after his discharge from Memorial Hermann, Petitioner was transferred to Kindred Rehab Hospital for inpatient rehabilitation. Ex. 6 at 23. Upon admission, he reported weakness and tingling in his extremities. *Id.* at 59. His gait was noted to be ataxic and markedly unsafe. *Id.* at 124. Petitioner remained in inpatient rehabilitation until January 28, 2015, when he was discharged home. Upon discharge, Petitioner was able to walk 800 feet with a rolling walker and was able to stand for 15 minutes. *Id.* at 264.

Petitioner followed up with his PCP on February 3, 2015. Ex. 4 at 31. He reported that his parathesias and pain were constant. *Id*. Petitioner indicated that he was "doing better after IVIG" and that he was continuing with outpatient PT. *Id.*

Petitioner visited Dr. Nguyen, a neurologist, on April 6, 2015 (approximately four months after vaccination). Ex. 5 at 8. The HPI section of the record indicates that Petitioner had attended outpatient PT three times per week since his discharge from Kindred Rehab Hospital. *Id.* Although Petitioner was able to walk a short distance, he still experienced weakness in his legs and numbness in his toes and fingers. *Id.* Petitioner also reported episodes of double vision every day when he was walking. *Id.* Dr. Nguyen's examination revealed that Petitioner had mild generalized weakness that was improving, decreased sensation in the fingers and toes, and the bottom of his left foot, and zero reflexes in all extremities. *Id.* Petitioner was unable to walk on his toes or his heels. *Id.*

Petitioner returned to Dr. Nguyen on April 27, 2015. Ex. 5 at 11. During this visit, he reported that he was still attending PT three times per week. He indicated that he was able to walk short distances with a cane, and that his legs were "a little stronger." *Id.* Dr. Nguyen noted improving mild generalized weakness, decreased sensation in big toes, and zero reflexes. *Id.* He indicated that Petitioner's gait was slow and that he was unable to walk on his toes or heels. *Id.* Dr. Nguyen recommended IVIG once per month. *Id.*

On July 22, 2015, Petitioner again visited Dr. Nguyen, and reported feeling better after IVIG and PT. Ex. 5 at 19. He noted that he felt stronger in the upper extremities more so than the lower extremities. *Id.* He continued to walk with a cane. *Id.* Petitioner indicated that the tingling sensation was better in his hands, but he still experienced tingling in his legs at times. *Id.* Dr. Nguyen noted improving mild generalized weakness, continued decreased sensation in his big toes, and zero reflexes. *Id.* He indicated that Petitioner's gait was improved but that he was unable to walk on his heels. *Id.* Dr. Nguyen recommended continuing PT two times per week and IVIG once per month. *Id.* He further recommended that Petitioner follow up in three months. *Id.* at 20.

On September 2, 2015, approximately nine months after vaccination, Petitioner visited his PCP. During this visit, he reported that he was experiencing paresthesia, pain, and muscle weakness that occurred constantly. Ex. 10 at 4. He completed IVIG and was engaged in outpatient PT. *Id.* Petitioner requested a disability placard for his vehicle. *Id.* A physical exam revealed that Petitioner had an unsteady gait and that he required a cane for ambulation. *Id.* at 5.

Petitioner visited his PCP on November 24, 2015. During this visit, Petitioner reported that he was feeling better, although he was still experiencing tingling in his feet at times. Ex. 9 at 1. He noted that his knees gave out occasionally, but he was not experiencing any pain. *Id.* The physical exam revealed improving mild generalized weakness, continued decreased sensation in his big

toes, and zero reflexes. *Id.* Petitioner had a normal gait without assistance but still could not walk on his heels. *Id.*

On November 9, 2016, Petitioner presented to his PCP for disability paperwork. Ex. 12 at 1-3. Petitioner reported that he was experiencing paresthesias, pain, and muscle weakness. *Id.* He described his symptoms as of moderate intensity and progressively worsening. *Id.* The record indicates that Petitioner left without being seen. *Id.* at 2, 3.

On January 24, 2017, Petitioner visited his PCP for follow-up on his hyperlipidemia. Ex. 12 at 4. Petitioner's gait was noted to be normal on examination. *Id.* at 5. Subsequent exams revealed similar findings. *See e.g.*, Ex. 17 at 2 (medical visit from November 15, 2017 noting no weakness, numbness, or tingling).

Petitioner visited Dr. Nguyen on July 26, 2018 to follow up on his GBS. Ex. 22 at 1. Dr. Nguyen noted that Petitioner's legs were stronger, but that they were easy to fatigue. *Id.* Petitioner was able to walk by himself, although he could not run. *Id.* Further, he experienced some tingling and numbness in his lower legs at times and was not experiencing pain. *Id.* On examination, Dr. Nguyen noted grossly normal motor strength, decreased sensation with pinprick in lower legs and right foot, and difficulty with heel to toe walking. *Id.* During this visit, Dr. Nguyen ordered an EMG/NCS study in the bilateral lower extremities. *Id.* Dr. Nguyen noted the impression of this testing was: "moderate diffuse sensorimotor peripheral polyneuropathy with mixed type which has been slowly improved when compared with the previous one done on 04/27/15." Ex. 23 at 1.

## IV.  TESTIMONY AT DAMAGES HEARING

Five witnesses testified at the damages hearing: Mr. Hood, Petitioner's life care planner, Ms. Johnson, Petitioner's vocational expert, Dr. Pollock, Petitioner's economist, Dr. McNulty, and Respondent's life care planner, Ms. Fox.

### A.  Petitioner

Petitioner worked as a butcher before his injury. In performing this job, he was required to lift and carry boxes that weighted 80-85 pounds; he worked with a saw and used knives the entire day. Tr. at 127-28. Petitioner testified that the position involved a significant amount of manual labor. *Id.* at 128. He was on his feet all day except for his lunch break. *Id.* Petitioner enjoyed his work. *Id.* at 129.

Before he developed GBS, Petitioner used to play outdoors with his daughter. Tr. at 130. He played different sports with her to include basketball, baseball, football, and pool. *Id.* After he was diagnosed with GBS, he was unable to actively play with his daughter because he was too weak and would become fatigued too quickly. *Id.*

Petitioner described his illness as one of the scariest times of his life. Tr. at 130. He was not sure whether he would ever walk again. *Id.* at 132. Petitioner testified that he initially had no feeling in his feet or lower extremities. *Id.* While he was in the hospital, he needed to be pulled by two people in order to sit up. *Id.* at 131. He also needed help going to the bathroom, which was

embarrassing. *Id.* He described experiencing pain from falling due to GBS, but also testified that he felt pain in his legs from the disease itself. *Id.* He stated, "You feel like a burden because every -- you know, you go from a guy who can do everything for himself and now everyone has to do stuff for you." *Id.*

Petitioner described that he still experiences residual fatigue in his legs. Tr. at 134. He testified that his legs are always kind of tired. *Id.* Additionally, he still experiences intermittent numbness in his toes and feet. *Id.* After 30 minutes on his feet, Petitioner testified that he needs to sit down and take a break. *Id.* at 135. He does not need to take medication for his GBS. *Id.* at 140.

Because of the numbness in his feet, Petitioner doesn't really drive anymore, and depends on his wife to drive him places. Tr. at 135. He described that it can be hard to feel the pedals due to numbness. *Id.* He testified that he can drive very short distances, and only in an emergency. *Id.* at 136. Ultimately, Petitioner recounted that he feels like a burden on his family. *Id.* at 138.

### B. Tresa Johnson, RN

Ms. Johnson is a registered nurse, a certified nurse life care planner, and a certified care manager. Tr. at 5. She has a Bachelor of Science degree in nursing from The University of Texas at Houston. *Id.* She has worked in healthcare for 20 years and as a life care planner for 15. *Id.* at 6. I recognized Ms. Johnson as an expert in the field of life care planning. *Id.* at 9.

Ms. Johnson testified that Petitioner currently can perform his activities of daily living independently, but she noted that he experiences fatigue when he stands or walks for more than five or ten minutes. Tr. at 7. She described that Petitioner still experiences "residual intermittent numbness and pain into his lower extremities." *Id.* at 8.

Ms. Johnson testified that before his injury, Petitioner was able to work full time as a butcher. Tr. at 100. Ms. Johnson noted that she prepared a life care plan, filed as Ex. 24. In drafting the life care plan, Ms. Johnson testified that she spoke with Dr. Nguyen, Petitioner's treating neurologist. Tr. at 101. Dr. Nguyen signed the document indicating that "the life care plan accurately reflects Mr. Brandon Hood's future treatment and is a fair and reasonable plan." *Id.* at 101-02.

After a break in the proceedings to confer with Respondent's life care planner, the two agreed on a number of items contained in the Respondent's life care plan (Ex. B). *See* Tr. at 105-07.

### C. Larry Pollock, PhD

Dr. Pollock earned his bachelor's degree in psychology from Stephen F. Austin State University. He completed a master's degree and a PhD in clinical psychology at Syracuse University. Tr. at 11. He established Project Reentry, which is a rehabilitation program that he continues to direct to this day. *Id.* Dr. Pollock has been performing vocational evaluations since 1986. *Id.* I recognized Dr. Pollock as an expert in the fields of psychology and vocational rehabilitation. *Id.* at 13.

Dr. Pollock testified that Petitioner dropped out of high school at around the 9th or 10th grade level. Tr. at 13. He had been working at a grocery store as a butcher for a number of years before his illness. *Id.* Dr. Pollock performed a number of tests on the Petitioner. One involved "a prolonged example of [his] participation in a work-like environment." *Id.* at 14. The purpose of this evaluation was to emulate what a typical "real world" work week would entail. *Id.* According to Dr. Pollock, Petitioner tires rapidly, both physically and mentally, during the course of one day, and over several successive days. *Id.* Dr. Pollock described Petitioner as very motivated to find gainful employment. *Id.* at 16.

Dr. Pollock testified that Petitioner demonstrated average intellectual ability in his verbal and nonverbal testing. Tr. at 18. His ability to read and understand written materials is on the 12th grade level. *Id.* at 19. However, Petitioner's problem area was in math, where he was functioning on a 4th grade level. *Id.* Dr. Pollock described Petitioner's math aptitude as "very poor." *Id.* Dr. Pollock also noted that Petitioner displayed deficits in manual coordination and finger dexterity. *Id.* at 23.

Dr. Pollock testified that in his opinion, Petitioner could be retrained into another field. Tr. at 32. He stated that it is important that Petitioner complete his GED in order to be employable. *Id.* at 39. Dr. Pollock also recommended additional training for Petitioner in order for him to enter the job market. Specifically, in order to pass the math portion of the GED, Dr. Pollock recommended that Petitioner receive tutoring to enable him to meet the minimum test requirements. *Id.* at 41. Dr. Pollock testified that the amount of time needed for tutoring is variable but approximated that anywhere from two to six months was reasonable for Petitioner to study and prepare for the GED. *Id.* at 42.

Dr. Pollock also discussed work hardening programs and indicated his opinion that such a program would benefit Petitioner. Tr. at 86. Dr Pollock estimated that these programs last between one and two months. *Id.* at 87.

### D.  Mark McNulty, PhD[3]

### E.  Laura Fox, RN

Ms. Fox is a registered nurse. She received her bachelor's and master's degrees in nursing. Tr. at 145. She received her life care plan certification in 1998, although she has been involved in life care planning since 1991. *Id.* I recognized Ms. Fox as an expert in life care planning and nursing. *Id.* at 147.

---

[3] Dr. McNulty has a PhD in economics and statistics. Tr. at 110. He worked at Kansas State University for 13 years teaching graduate level courses in both statistics and economics. *Id.* He then worked as an economist in the private sector for several years before relocating to Wyoming. *Id.* at 111. For the past 12 years, he has been conducting economic and statistical analyses related to litigation. *Id.* I recognized Dr. McNulty as an expert in economics. *Id.* at 113-14. While I have considered Dr. McNulty's testimony, I have not summarized it here as the parties have agreed on Petitioner's lost wages.

Ms. Fox testified that she met with the Petitioner on June 12, 2018 at his home in Porter, Texas. Tr. at 148. Ms. Fox testified that when she met with Petitioner his functional abilities had improved when compared to the time surrounding his hospitalization. *Id.* at 152. Ms. Fox noted that Petitioner was not taking IVIG, he did not need assistive devices to walk, he was able to do laundry, he was able to drive short distances, and he did not experience chronic pain. *Id.* at 152. Ms. Fox also noted that Petitioner has not returned to his neurologist since 2018. *Id.* at 154. Ms. Fox testified that Petitioner still experiences fatigue and numbness. *Id.* at 153. In addition, he is not able to stand for long periods of time. *Id.*

## V.     CONTENTIONS OF THE PARTIES

On July 13, 2017, Respondent conceded that Petitioner was entitled to compensation. Resp. Rept. at 1. From January 2018 through May 2020, the parties engaged in settlement discussions, but were unable to agree upon an amount. Thus, the issue before me is the amount of damages to be awarded for: 1) Mr. Hood's pain and suffering and emotional distress; 2) the costs of a math tutor to prepare for the GED; 3) the costs associated with a work hardening program, to include the cost of the program itself, and the cost of transportation to the program. The parties have agreed that Petitioner is entitled to $285,186.00 in loss of earnings.

### A.  Petitioner's Position

Petitioner proposes an award of $250,000.00 for past pain and suffering. He notes that the sequelae of his illness have been severe and have persisted for more than six years. Petitioner's Brief ("Pet. Brief") at 1, filed May 24, 2021 (ECF No. 109). Petitioner experienced physical pain as a result of his GBS, but he has also experienced emotional pain. Pet. Brief at 6. Because of his injury, he has been forced to rely on his wife to support their family. *Id.*

Petitioner argues that it is not appropriate to use comparable Vaccine Program cases as a guide because many of these cases represent a "low-ball continuum artificially created by Respondent." Pet. Brief at 4-5. Petitioner further requests that if I do not award $250,000.00 for past pain and suffering, that I award future pain and suffering until that cap has been met. *Id.* at 5.

Petitioner proposes that he also be awarded $1,360 in math tutoring expenses, which he calculates at a rate of $40 per hour for a period of four months (two sessions per week for four months, or 34 sessions). Pet. Brief at 7; Ex. 34 at 3. Petitioner additionally requests $13,824.00 in work hardening expenses ($460.80 per day for six weeks, five days per week). *Id.* at 8. Petitioner asks that he be compensated $1,440.00 to take an Uber to his work hardening program (five round trips per week for six weeks at $48 per round trip). *Id.*; Ex. 34 at 3. Petitioner notes that he will eventually be trained to drive a hand controlled vehicle, but that this training will take time. Thus, he argues that compensation for Uber is appropriate. *Id.*

### B.  Respondent's Position

Respondent considers $140,000.00 to be an appropriate pain and suffering award. Respondent's Brief ("Resp. Brief"), filed May 24, 2021, at 14 (ECF No. 110). In his brief, Respondent recognizes that GBS cases "have historically run the spectrum from cases involving

severe sequelae requiring life care plans to assess prospective damages, to cases in which the petitioner nearly or completely recovers shortly after the six-month minimum duration of symptomatology required to qualify for compensation." Resp. Brief at 12. Respondent contends that Petitioner's "clinical course documented by his medical records demonstrates a less severe course of GBS than others." *Id.* at 13.

Respondent raises the fact that Petitioner's in-patient hospitalization was limited to roughly two weeks, whereas some GBS patients require hospitalization for weeks or months. Resp. Brief at 13. Respondent likewise notes that Petitioner gained strength after his hospitalization. He did not need assistive devices to walk and did not require pain medication. *Id.* The most recent medical records indicate that Petitioner "is independent in most daily life activities and requires no ongoing neurological care." *Id.* Respondent concludes that "based on the objective record, petitioner's GBS and resulting sequelae are relatively mild when compared to other GBS claims." *Id.* Respondent did not address Petitioner's request for future pain and suffering damages.

With respect to the other expenses, the parties have agreed to use Ergo Rehabilitation for work hardening. Resp. Brief at 14. The cost of this program is $460.80 per day. *Id.* Respondent recommends four weeks of work hardening for a total cost of $9,216.00. *Id.* at 14-15. Respondent argues that the six weeks of work hardening proposed by Petitioner may be more burdensome than beneficial. *Id.* at 15. Respondent further contends that because the life care plan provides for the installation of hand controls on Petitioner's car, he should drive himself to and from the work hardening program. *Id.* The costs associated with these transportation expenses are $121.60 ($6.08 per roundtrip for 20 trips). *Id.* Finally, Respondent recommends 16 math tutoring sessions (two hours per week for eight weeks) at a cost of $35 per hour (the median and not the average cost of the tutors). The total cost Respondent recommends for this expense is $560.00.

## VI.   DISCUSSION AND ANALYSIS

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), originally issued Apr. 19, 2013 ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("The assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *See I.D.*, 2013 WL 2448125, at *9; *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000." § 15(a)(4). In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering. *See I.D.*, 2013 WL 2448125, at *9-11, *citing McAllister*, 1993 WL 777030, at *3. In evaluating these factors, I have reviewed the entire record, including medical records, documentary evidence, affidavits submitted by Petitioner and others, and hearing testimony.

**A.  Determining Petitioner's Award in this Case**

In determining an award in this case, I do not rely on a single decision or case. Rather, I have reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other relevant cases, as well as my knowledge and experience adjudicating similar cases.

1.  Awareness of Suffering

In my experience, awareness of suffering is not typically a disputed issue in cases involving GBS. In this case, neither party has raised, nor am I aware of, any issue concerning Petitioner's awareness of suffering and I find that this matter is not in dispute. Thus, based on the circumstances of this case, I determine that Petitioner had full awareness of his suffering.

2.  Severity of the Injury

Prior to Petitioner's hospital admittance, he sought medical treatment three times, complaining of progressively worsening numbness and weakness. He fell on four occasions, suffering foot and hand fractures as a result. Ex. 4 at 13. When Petitioner was admitted to Memorial Hermann Hospital, he was hospitalized for approximately six days then admitted to inpatient rehabilitation for ten days post-hospitalization. Petitioner's GBS course required him to complete treatment with prednisone, and two courses of IVIG. His injury and treatment necessitated rehabilitation therapy which began during his hospitalization and continued in his inpatient rehabilitation stay. Petitioner continued PT after his discharge from inpatient rehabilitation. (*See* Ex. 5 at 11, April 27, 2015 record noting that Petitioner had attended outpatient PT three times per week since his discharge from Kindred Rehab Hospital; Ex. 5 at 19, July 22, 2015 record where Dr. Nguyen recommended continuing PT two times per week; Ex. 10 at 4, September 2, 2015 record noting that Petitioner had continued outpatient PT). Based on these records, Petitioner has completed approximately 86 outpatient PT sessions as of September 2015. Petitioner continues to experience easy fatiguability in his legs. He is unable to walk or drive long distances. Additionally, Petitioner still has numbness and tingling in his feet. Ex. 13 at 1.

Petitioner's testimony establishes that GBS interfered with his ability to work. He was unable to return to his position as a butcher since his illness began. His job required him to lift heavy boxes, use knives, and stand on his feet all day. Because of the ongoing nature of his GBS injuries, Petitioner has been unable to return to this job, which he greatly enjoyed. Tr. at 129.

GBS also altered Petitioner's family and social life. Petitioner's relationship with his daughter has been impacted, as he is now unable to play outside with her the way he used to before his GBS. He is limited in the activities he can perform with his family and friends due to his reduced physical stamina.

3.  Duration of the Suffering

Petitioner continues to deal with the residual symptoms of his GBS to this day. He continues to live with residual fatigue in his legs. Tr. at 134. Additionally, he still experiences intermittent numbness in his toes and feet. *Id.* Although Petitioner does not experience chronic pain, he did suffer from pain associated with his GBS through November of 2016, just under two years after onset of his GBS. *See* Ex. 12 at 1-3.

## B.  Comparison to Other GBS Awards

I have considered other GBS damages decision in arriving at my determination in this case. One such case that I considered is *Johnson v. Sec'y of Health & Hum. Services*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018). Petitioner Debra Johnson received an award of $180,000.00 in actual pain and suffering after her diagnosis of GBS following a flu vaccination.

The petitioner in *Johnson* was a school bus driver who lived in rural Maine. She was hospitalized for five days after developing GBS. Ms. Johnson did not attend inpatient rehabilitation and did not take any medications after her hospitalization, although it took her months after her discharge from the hospital to be able to walk on her own. Similar to Mr. Hood, Ms. Johnson also spent time enjoying the outdoors with her family, an activity that was limited as a result of her illness. Ms. Johnson was able to go back to full time work after approximately 10 months, although her GBS interfered with her work schedule, requiring her to cut back on hours and rest in the middle of the day. Ms. Johnson spent four months where she was unable to drive due to the numbness in her feet. As of the time of the damages decision, Ms. Johnson still experienced increased fatigue, periodic incontinence, as well as continued numbness in her legs and feet.

I additionally considered the case of *Dillenbeck v. Sec'y of Health & Hum. Services*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), remanded on other grounds. Petitioner, Gayle Dillenbeck received $170,000.00 in actual pain and suffering after her diagnosis of GBS following a flu vaccination. *Id.* at 14. Ms. Dillenbeck was hospitalized for two weeks and had multiple rounds of IVIG therapy. *Id.* at 3. Prior to the flu shot, Ms. Dillenbeck was generally healthy and participated in a number of outdoor activities including hiking and walking with her dogs. *Id.* However, due to GBS, she could no longer complete the long walks she was accustomed to and often experienced generalized fatigue and tiredness. *Id.* at 4.

Also, due to her GBS, Ms. Dillenbeck was out of work for approximately four months. *Dillenbeck*, 2019 WL 4072069, at 2. During that time, she required live-in care from three family members who helped care for her animals and completed household tasks. *Id.* at 3. Ms. Dillenbeck took eight Gabapentin pills per day due to pain. *Id.* Due to the persistent pain she had trouble sleeping. *Id.* She attended outpatient PT two to three times per week. *Id.* Ms. Dillenbeck had numerous falls even while using her walker. *Id.* She received outpatient physical therapy and was discharged within a month. Ms. Dillenbeck continued to experience lack of sensation in extremities, weakness in her hands, increased sensitivity on chest, abdomen, and back, and generalized fatigue two and a half years post-hospitalization.

There are similarities between Petitioner's case and both Ms. Johnson's case and Ms. Dillenbeck's case. All three were hospitalized for roughly equivalent periods of time; each

11

attended PT or in home therapy; each experienced limitations in the activities they had previously enjoyed; and each dealt with permanent symptoms as a result of their illnesses. However, unlike the petitioners in *Johnson* and *Dillenbeck*, Mr. Hood has not been able to return to work or drive for more than a few miles since his hospitalization. Ms. Dillenbeck began work four months after her hospitalization, and Ms. Johnson was able to resume part time work three months after her hospitalization and went back to her regular duties after approximately ten months. Additionally, while Ms. Dillenbeck was discharged from outpatient physical therapy within a month, Mr. Hood continued to perform outpatient PT for more than seven months. These differences suggest that Mr. Hood experienced a more severe course of illness than either Ms. Johnson or Ms. Dillenbeck.

### C. Petitioner's Pain and Suffering

For all of the reasons discussed above and based on consideration of the record as a whole, I find that $200,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering and emotional distress. The medical records demonstrate that Petitioner suffered a moderate course of GBS. In terms of duration, I note that Mr. Hood has been dealing with the residual symptoms of his GBS for more than six years. He has been unable to drive for more than a few miles at a time and has been unable to return to work since his hospitalization.

I also find that Petitioner is entitled to a future pain and suffering award. Mr. Hood continues to experience muscle weakness and numbness in his lower extremities. He tires very quickly and is only able to stand for 15-30 minutes before he needs to take a break. He also described how he is unable to perform activities that he formerly enjoyed with his daughter. Based on my consideration of these matters, I find that an award of $1,000.00 per year is appropriate. In awarding future pain and suffering of $500.00 per year in *Dillenbeck*, Chief Special Master Corcoran noted that, "[l]ifetime/ future pain and suffering awards in other contexts tend to avoid large lump sums in favor of more conservative annual awards." *Dillenbeck*, 2019 WL 4072069, at *15. While Mr. Hood does continue to experience residual symptoms of his illness, he is not taking medication to treat his GBS; he is able to complete his activities of daily living; and he does not experience chronic pain. For these reasons, I find that a more conservative annual award is appropriate in this case.

### D. Petitioner's Vocational Expenses

The parties agree that Petitioner is entitled to receive expenses for a math tutor, a work hardening program and transportation to the work hardening program. They disagree on some particulars involving these costs.

#### 1. Math Tutor

Petitioner's math skills have been assessed at a fourth grade level. Accordingly, he will need the services of a math tutor in order to successfully complete his GED. Dr. Pollock opined that Petitioner would require between two and six months of math tutoring. Tr. at 42. Petitioner proposes four months of math tutoring, the middle of Dr. Pollock's range, while Respondent recommends two months, the bottom end of the range. Further, Petitioner indicates that an appropriate hourly rate for a math tutor is $40 per hour, while Respondent recommends a rate of

$35 per hour (the median and not the average cost of the tutors). I find, consistent with Petitioner's position, that four months of math tutoring at a rate of $40 is appropriate in this case. Petitioner's math skills are deficient enough that it is appropriate to adopt a more conservative approach, consistent with the middle and not the bottom end of Dr. Pollock's recommended range. Further, I see no reason not to apply the average cost of tutors in Petitioner's area, which is $40 per hour. Petitioner shall be awarded $1,360.00 in math tutoring expenses.

### 2.  Work Hardening Program

The parties agree that Petitioner should complete a work hardening program with Ergo Rehabilitation before returning to the workforce. The cost of this program is $460.80 per day. Dr. Pollock recommended a range of one to two months of work hardening. Tr. at 87. Petitioner contends that six weeks of work hardening is appropriate, while Respondent instead recommends four weeks, arguing that the six weeks of work hardening proposed by Petitioner may be more burdensome than beneficial. Ms. Johnson noted that "[a]lthough Ms. Fox's and my research indicate[s] most clients participate in work hardening for one month, it is not unreasonable to anticipate that Mr. Hood could require a bit longer than most participants." Ex. 34 at 2. This is due to the fact that Mr. Hood has been out of the work force since 2015. *Id.* I agree with this assessment and find that Mr. Hood should be awarded costs to participate in six weeks of work hardening. Such costs amount to $13,824.00.

### 3. Transportation Expenses

Finally, both Petitioner and Respondent agree that Mr. Hood should be awarded costs associated with his transportation to his work hardening program. Petitioner contends that he should be reimbursed for roundtrip Uber fares, while Respondent argues that roundtrip mileage is appropriate.

Both parties recommend that Mr. Hood receive an adaptive driving evaluation and training from Strowmatt Rehabilitation and also have hand controls installed on his car. Petitioner argues that he would not be able to complete this process and also attend his GED courses. Ex. 34 at 2. Ms. Fox notes that Petitioner is a good candidate for adaptive evaluation and training as he does not have any cognitive deficits and does not have extensive GBS needs. Ex. G at 2. She also notes that Petitioner requested $800 for training on hand controls, which equates to approximately four hours of training. *Id.* This request is further evidence that Petitioner will likely not require extensive training on hand controls. Ms. Fox additionally notes that Strowmatt Rehabilitation books one to two weeks out for the evaluation and that most hand controls are in stock and can be installed same day. *Id.* Because the process will take about one month, Petitioner could complete the appropriate training and the installation of hand controls during the time he begins his GED program. *Id.* I agree with this assessment. It is not unreasonable to require Petitioner to schedule the installation of hand controls and schedule four hours of training and an adaptive driving evaluation either concurrently with his GED preparation or after this preparation is complete but before he begins the work hardening program. Petitioner shall be awarded the medical mileage rate of .16 per mile, or $6.08[4] roundtrip for a total of 30 roundtrips, for a total amount of $182.40.

---

[4] Nurse Johnson indicated that the Petitioner should be reimbursed $5.76 roundtrip. However, 38 miles at .16 = $6.08.

13

## VII.    CONCLUSION

In light of the above analysis, and in consideration of the record as a whole, I find that Petitioner shall be awarded $200,000.00 in compensation for past pain and suffering and $1,000.00 per year reduced to net present value, for the rest of his life expectancy, for future pain and suffering. In addition, he shall receive $1,360.00 in math tutoring expenses, $13,824.00 in work hardening costs, and $182.40 in transportation expenses.

**By Thursday, November 18, 2021**, the parties shall file a joint status report (1) converting my award of future pain and suffering to its net present value, and (2) providing a statement of all damages, including those that the parties have agreed upon as well as those I have decided, in the manner that the parties would like for that information to appear in the damages decision. Once these issues have been resolved, a damages decision will issue.

**IT IS SO ORDERED.**

**s/ Katherine E. Oler**
Katherine E. Oler
Special Master
